[No. 21441. Department One. December 20, 1928.]

M. R. JAMIESON, *Respondent,* v. PATRICK DALY *et al., Appellants,* BIG MISSOURI MINING COMPANY *et al., Defendants.*[1]

*L. L. Thompson (Henderson, Carnahan & Thompson,* of counsel), for appellants.

*Bates & Peterson,* for respondent.

MITCHELL, J.—The plaintiff, M. R. Jamieson, and the defendant, Patrick Daly, have for a great many years engaged in prospecting, locating, developing and selling mines. Daly has spent about all of his time at that business. They have been acquainted since 1910, having many business transactions with each other and always good friends.

Hyder, Alaska, and Stewart, B. C., situated within a short distance of each other, are surrounded by a considerable mining region. Some years prior to 1922,

[1] Reported in 272 Pac. 966.

Jamieson and Daly became residents of Hyder, from which they pursued their business, Jamieson much of the time operating a hotel in which he maintained an office, while Daly was out in the hills and mines.

As usual, they had their financial ups and downs, each frequently helping the other in a personal way. They frequently helped each other in their mining ventures and in interesting outsiders to invest in mining property. Proceeds from ventures that succeeded were usually divided equally between them, whether so expressly understood originally or not, according to what seemed to be the common rule in that region, as testified to by Daly.

In the latter part of 1922, it became necessary, in attempting the sale of a mine belonging to a third party, upon which they held an option, for one of them to go to New York. Being without means, Jamieson arranged, upon his guaranty, a loan of one thousand dollars by a third party to Daly for him to make the trip. Upon his getting the money and before leaving for New York, they entered into the alleged oral agreement upon which the present action rests, as follows: Daly said,

"I am going—the $1,000 that you have got for me I will spend in expenses; it will be all gone in expenses, and I am entitled to two-thirds of the profit of the Yellowstone deal and you will get one-third, . . ." to which Jamieson said:

"That's all right, Pat; but if I go to New York or anywhere else to make a deal I am entitled to two-thirds, I will be paying my own expenses. That was agreed to. . . . From now on we will do business on those terms. We both agreed to it."

Later on Jamieson joined Daly in New York, but they failed to sell the Yellowstone mines.

Upon their return to Hyder, they continued their operations, Jamieson taking the lead in attempting to

sell still another mine. That attempt failed. Thereafter, through the efforts of Jamieson in bringing the parties together, a prospective purchaser was obtained for the Big Missouri group of mines. By agreement among the parties, Daly accompanied the prospective purchaser to Vancouver, B. C., to close the deal with the owner. Jamieson furnished Daly some eighty or one hundred dollars on his expenses of the trip. The deal fell through.

Daly remained in Vancouver some time, trying to interest others, during which time Jamieson sent him other small amounts of money. There was considerable correspondence between them, during this time, discussing efforts being made to dispose of the mines. Finally Daly went to Tacoma and interested parties who bought the Big Missouri mines. A contract was entered into between the parties, by which, as soon as the stock was issued, Daly should receive three hundred thousand shares.

He returned to Hyder, told Mr. and Mrs. Jamieson of the sale and felicitated with them upon the success of the venture; and stated that one-third of it, of course, was theirs. He left the contract with Jamieson for six weeks to be kept in Jamieson's safe. Daly then came to Seattle and opened an office. Some months thereafter a banker of Hyder called on Daly, in Seattle, at the request of Jamieson, for some of the stock. Daly gave an order that five thousand shares be issued to Jamieson, but the banker could not wait until necessary transfers were made. Upon that report to Jamieson, he soon came to Seattle and got an order from Daly for twenty thousand shares, which were issued by the company in Tacoma to Jamieson.

Thereafter this suit was brought for the remaining eighty thousand shares. Mrs. Kate O'Neill, a sister of Daly, was made a party defendant upon the alle-

gation that, without consideration, Daly's stock stood in her name on the books of the company; and the Big Missouri Mining Company and its officers were made defendants to make effective temporary restraining and injunctive orders sought and obtained during the pendency of the action, and also for the purposes of a final judgment. The defendants Daly and Mrs. O'Neill answered with general denials. The mining company and its officers set up the existence of an arrangement by which, in good faith, it had entered into an escrow or pooling agreement with Daly, the owner of his stock, for a specified time, and that the bank held the stock accordingly.

On the trial findings and conclusions were entered in favor of the plaintiff, with the exception that the rights of the mining company under its pooling agreement were preserved. A motion for a new trial, made by Daly and Mrs. O'Neill, was denied. Judgment was entered on the findings and conclusions. Patrick Daly and Mrs. O'Neill have appealed.

The first contention on behalf of the appellants is that assuming, without admitting, the partnership, respondent's remedy was for a general accounting and dissolution of the partnership. Under the terms of the agreement, there was no necessity for a general accounting—each party was to stand his own expenses. True, in addition to respondent's other activities, he furnished Daly with some expense money in handling this deal, but that was done, not because of the contract, but because of their customary free, easy and helpful way towards each other.

The agreement alleged and testified to by the respondent and denied by the appellants in their pleading and in the testimony on their behalf, presented the principal issue in the case. The respondent testified that such agreement was made; Daly testified that it

was not made. The respondent was strongly and convincingly corroborated by disinterested witnesses. One of such witnesses testified that, on one occasion, just after the agreement is alleged to have been made, respondent and Daly, in his presence and at the Jamieson home, explained to Mrs. Jamieson the agreement they had come to, mentioning its terms, as alleged in the complaint and found by the trial court. Another witness from Hyder, who had represented the former owner of the mines, called on Daly in his office in Seattle. He testified:

''After we had discussed the Big Missouri for some little time, Mr. Daly drew me a map of the cross-fractures and the tunnels that they had driven, in their prospecting work; and I said to Mr. Daly, 'Now what do you really think are the possibilities of the Big Missouri making good?' 'Well,' he says, 'if my estimates prove to be correct, it is going to be a very big mine.' I said, 'Well then, that will make you fellows—meaning Jamieson and him—plenty of money'. He said, 'Yes, if I am not mistaken, we will have plenty out of this; and Jamieson gets one-third and I get two-thirds'; and while he was talking, he had a little piece of paper that he had been scribbling on, and he set down figures as I recollect now of a little over 300,000 shares of stock that they were to get in the deal, and he divided that by three, and he says, 'That is what Jamieson gets'.''

Another such witness, in close touch with the parties in Tacoma who purchased the mine, testified that, some time after the stock had been issued, upon speaking with Daly of a rumor to the effect that Daly had given Jamieson one-half of his stock, Daly replied:

''Well, well, how those things do get mixed up; why should I be giving him half of the stock when he already owned one-third of it.''

Mrs. Jamieson, an interested witness of course, testified to the terms of the agreement. Many of the

letters written by Daly to Jamieson contained statements strongly corroborative of an agreement between them, though the specific terms were not mentioned. Daly denied all the conversations testified to by the witnesses as to the agreement, and it may be said that in some of the other facts and circumstances there were inferences favorable to him; but without setting them out it can be said that such inferences were fairly met and explained away by the respondent.

Out of this conflict in the testimony, the trial court was satisfied with the respondent's version of the controversy, and upon a consideration of all the testimony, we are satisfied that it clearly and convincingly sustains the findings and conclusions reached by the trial court.

Nor was there any error in the finding and judgment against Mrs. O'Neill. The purported transfer of the stock to her was without consideration and never intended as between them, as we view the evidence, to deprive him of the dominion and control over it. After the purported transfer, he made several *bona fide* efforts to dispose of the stock as his own, and did finally put it in escrow under a pooling arrangement with the mining company.

Affirmed.

FULLERTON, C. J., TOLMAN, HOLCOMB, and BEALS, JJ., concur.